NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190158

NO. 4-19-0158

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 11, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>　　　　Plaintiff-Appellee,<br><br>　　　　　　v.<br><br><br>RICHARD A. CORTEZ,<br>　　　　Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>Champaign County<br>No. 90CF1405<br><br><br>Honorable<br>Jason Matthew Bohm,<br>Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Richard A. Cortez, appeals the circuit court's first-stage dismissal of his *pro se* postconviction petition, arguing his petition stated an arguable claim that the natural life sentence he received for first degree murder, an offense he committed at the age of 18, violated both the United States and Illinois Constitutions. We affirm.

¶ 2 I. BACKGROUND

¶ 3 In December 1990, defendant pleaded guilty to three counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(a)(1), (2)) in connection with the stabbing death of Jennifer Amerio. During guilty plea proceedings, the State presented a factual basis indicating that shortly after 1 p.m. on August 13, 1990, police officers responded to an apartment complex in Champaign,

Illinois, and observed Amerio's body in the parking garage of the complex. Her body was unclothed, wet with water, and appeared to have numerous stab wounds. An examination later revealed "what appeared to be 15 stab wounds caused by a knife" and that Amerio bled to death from two wounds that penetrated her lungs and aorta.

¶ 4　　　　The State's factual basis also indicated that "[t]he police followed a very obvious trail of blood from [Amerio's] body to" the bathroom of her apartment, where there "was also a considerable amount of blood." They then followed a more "slight trail of blood," which led in the opposite direction and to defendant's apartment, approximately 100 yards away. Around 3 or 3:30 p.m. the same day, a police officer observed defendant returning to his apartment with bandages on his hands. Thereafter, defendant spoke with the police and confessed to observing Amerio go inside her apartment, entering Amerio's apartment with a knife, and stabbing her in the bathroom. He also led the police to an area of his apartment complex where items from Amerio's apartment were recovered. Amerio's roommates identified the items as having been in their apartment prior to her death. Defendant's fingerprints were found on one of the items and on a jewelry box that was still inside Amerio's apartment.

¶ 5　　　　Defendant's sentencing hearing was conducted over three days in February 1991. The record reflects the State sought the death penalty on the basis that defendant murdered Amerio during the commission of a forcible felony—residential burglary or home invasion. Defendant waived his right to have a jury determine his eligibility for the death penalty, electing to have the matter decided solely by the trial court. During the eligibility stage, the State presented testimony from crime scene technicians and law enforcement officers involved in investigating the murder, as well as Amerio's roommates and friends.

¶ 6　　　　The State's evidence showed Amerio's body was found in the parking garage of

her apartment complex. Blood was found in a bathroom in her apartment, and as indicated, a trail of blood led from the apartment and to the parking garage where her body was discovered. Amerio's autopsy report showed she suffered abrasions to her face and multiple "stab-cutting" wounds, including seven stab wounds to her back, some of which caused injuries to her lungs and aorta.

¶ 7        Alan Atteberry, a sergeant with the Champaign Police Department, testified that following the murder, he spoke with defendant at his apartment. Defendant reported that he injured his hands while slicing bacon and denied being at Amerio's apartment complex. After defendant was arrested and read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), Atteberry spoke with defendant at the police department. Initially, defendant again denied any involvement in the murder. Ultimately, however, he admitted his involvement in the stabbing.

¶ 8        Defendant reported to Atteberry that he observed Amerio "coming across" a back alleyway as he was sitting outside his apartment. Defendant told Amerio she "look[ed] good" and that the two should "get together sometime." Amerio responded that she "wouldn't get together with [defendant] ever" and kicked him on his right ankle, stating "that's about the most we'll ever do." Defendant called Amerio "a b***" and pushed her. He asserted Amerio then attempted to knee him in the groin. When Amerio walked away, defendant followed her and saw where she lived. After Amerio entered her apartment, she leaned out of a window and called defendant "an a***."

¶ 9        Defendant asserted he returned home and became progressively angry about how he had been treated. He decided to go to Amerio's apartment to "get back at her" by possibly cutting up her furniture or taking her jewelry and throwing it on the ground. Defendant reported taking his roommate's knife with him to Amerio's apartment, asserting he intended to use it to get

into her apartment. However, when defendant arrived at the apartment, the door was unlocked. He entered the apartment, picked up some jewelry, and then went to the bathroom where Amerio was showering. Defendant stated he pulled back the shower curtain and yelled at Amerio, who "freaked" and started slapping him. Defendant maintained he tried to shove Amerio away, forgetting about the knife in his hand. He "guess[ed]" that he was "cutting" Amerio as he was pushing her away. Defendant stated that Amerio eventually let go of him and ran out of the apartment. He also exited the apartment and went in the opposite direction from Amerio. After the incident, defendant returned to his apartment and hid the clothing he had been wearing in a storage area of his apartment building behind a plant. He returned the knife to his roommate's bedroom. Defendant maintained that he had not planned on hurting anyone and "didn't mean to do it."

¶ 10      The State's evidence further showed that a search warrant was executed on defendant's apartment building. Defendant led the police to the knife he used and the clothing he wore during the stabbing. The clothing was discovered in the basement level of his apartment building along with items of jewelry taken from Amerio's apartment.

¶ 11      Defendant testified on his own behalf at his sentencing, stating he was 18 years old in August 1990. His description of the stabbing and the events surrounding it was similar to the statement he gave Atteberry after his arrest. Specifically, defendant asserted he was involved in a verbal and physical altercation with Amerio before entering her apartment with a knife, taking jewelry, and confronting her in the shower. Defendant testified that after he pulled the shower curtain back and yelled at Amerio, she "came after" him, grabbing him by the hair and one of his shoulders. He stated he "kept trying to shove her away *** so that [he] could leave" while holding the knife. Defendant testified Amerio eventually let go of him and left. He realized that he had hurt her when he saw her from behind and observed blood. Again, defendant maintained that he did

not intend to harm Amerio when he went to her apartment and that he took the knife "[j]ust to pry open the door."

¶ 12        Ultimately, the trial court found defendant eligible for the death penalty. The matter then proceeded with the second phase of defendant's sentencing, during which the court considered defendant's presentence investigation report (PSI) and aggravating and mitigating evidence presented by the parties.

¶ 13        The State's evidence in aggravation included testimony that defendant had attacked a woman in her home a few weeks prior to Amerio's murder and previously exhibited strange and troubling behavior. Elena Ostrem, a Champaign resident and student at the University of Illinois, testified that during the early morning hours of July 24, 1990, she awoke to a man standing over her bed, whom she identified as defendant. During the incident, defendant "threw" Ostrem to the floor, hit and punched her, strangled her with his hands, twisted her neck, and headbutted her. Ostrem denied ever seeing defendant prior to the attack. After the attack and following Amerio's murder, she saw photographs of him in the newspaper. Later, during a police lineup, she identified him as her attacker.

¶ 14        The State's evidence further indicated Ostrem's attacker utilized a balcony door to her apartment that had been left unlocked. Following his arrest for Amerio's murder, defendant reported to Sergeant Atteberry that he had a sore ankle from jumping off a balcony "one night late in July." However, according to Atteberry, defendant denied going to Ostrem's apartment.

¶ 15        Caroline Glennon testified she was friends with Amerio and, during the summer of 1990, began to have concerns about defendant, who was also one of her neighbors. She stated she often had to pass by defendant's apartment and "[m]ore times than [she could] count," would see defendant staring at or "intent[ly] watching" her from the back porch or windows of his apartment.

Glennon had conversations with Amerio about defendant. She recalled Amerio asking if Glennon had seen defendant, if defendant ever said anything to Glennon, and if defendant scared Glennon.

¶ 16        Jennifer Ashenfelter testified she became acquainted with defendant in the eighth grade. For approximately "a month or so," defendant followed her home from school a couple of times a week. On one occasion, he waited outside her house and in her backyard. Ashenfelter reported what was happening to her mother, who called the school principal. However, defendant's behavior did not immediately stop, and on another occasion, he followed her from a school bus stop to a friend's house. Defendant waited in the friend's backyard, and the friend's mother "had to go out and tell him that he had to leave."

¶ 17        Sallie Roth, a special education teacher, testified defendant was one of her students during portions of his junior and senior years of high school. She recalled giving defendant an assignment called "100 Journal Essay Story Topics," which consisted of a worksheet with 100 unfinished sentences that defendant was asked to finish. Roth became alarmed by defendant's responses to the assignment, which included numerous statements about death and killing people. She showed defendant's worksheet to one of the school's deans, and a meeting was conducted with defendant and his parents. Following the meeting, defendant was to have no contact with Roth.

¶ 18        In mitigation, defendant also presented several witnesses, including his mother, father, stepfather, and brother. Testimony from defendant's family showed defendant's father drank and was physically abusive to defendant's mother during their marriage. At the age of six, defendant moved with his mother and brother from Arizona to Champaign, and his mother remarried. After his move, defendant had infrequent contact with his biological father.

¶ 19        In school, defendant had behavioral problems and was made fun of for his Hispanic

background. Both of defendant's parents and their families were of Hispanic origin and fluent in Spanish; however, defendant did not speak Spanish and felt like he did not "fit in" with his family members in Arizona. In high school, defendant enjoyed playing football. His mother described him as helpful around the house but also stated that conflicts arose over defendant staying out past his curfew. She did not allow defendant to take driver's education courses at the age of 16 because defendant "didn't show [her] any responsibility." Therefore, defendant did not obtain his driver's license until he turned 18. During his senior year of high school, defendant signed paperwork to join the Marines and expressed to his father that he wanted to be a police officer. In May 1990, defendant moved out of his mother and stepfather's home.

¶ 20        Defendant also presented the testimony of Dr. Arthur Richard Traugott, a psychiatrist who evaluated him at the request of his attorney. In classifying defendant, Dr. Traugott considered him an "adolescent." He determined defendant was competent to stand trial and not insane and suffered from no mental disease or defect under the legal definition of insanity. However, Dr. Traugott opined defendant did suffer from a developmental reading disorder, which he described as a learning disability. He found that secondary to that disorder, defendant also showed "evidence of emotional immaturity." Dr. Traugott testified defendant had "an immature outlook on the future" and opined that at the time of the murder, defendant was "under extreme influence of this pervasive developmental reading problem and its manifestations over a number of years." Finally, he testified that in his work, he had not encountered anyone who appeared more remorseful for his or her actions than defendant.

¶ 21        L.W. Douglas testified he was an addictions counselor who also evaluated defendant at the request of his attorney. He noted defendant's use of alcohol and marijuana began "at a relatively young age" and he used both substances regularly. Douglas believed that defendant

had impaired emotional and mental development as a result of his substance abuse. He estimated defendant's emotional development to "be about the age of 14 or 15."

¶ 22    Faye Catchings testified she was a high school teacher for students with learning disabilities and behavior disorders. She taught defendant for four years and described him as "lazy, but willing to try," "[s]ometimes very childish," and "very immature for the age that he was in school." Catchings also stated defendant exercised "poor judgment" when making decisions, acted "impulsively," and exhibited problems with self-esteem. She recalled an occasion when defendant got into a physical altercation with a classmate. Additionally, she stated that defendant told her about the incident involving Roth and asserted he had been "joking." Catchings testified that although defendant was "a slow learner," he "would have done okay in a learning disabilities program in college." Finally, she stated her belief that defendant had "good in him."

¶ 23    Defendant further presented testimony from his friends and a former work supervisor. Valerie Horak testified she had known defendant for two years. She recalled occasions when defendant assisted her after she was injured in a car accident and when her mother required medical assistance. Tara Haynes stated she was defendant's girlfriend and described observing positive interactions between defendant and his stepfather's grandmother, as well as the young children that she babysat. Steve York testified he had known defendant for approximately two years and was his work supervisor at Osco Drug for approximately one year. He described defendant as "nice, quiet, [and] kinda shy" and a "good employee."

¶ 24    Again, defendant testified on his own behalf. He asserted he only followed Ashenfelter home from school twice and that those incidents occurred when he was 14 years old. Subsequently, he apologized to Ashenfelter for scaring her, informing her he "didn't mean anything by it" and only wanted to get to know her. With respect to the incident involving the

worksheet assigned by Roth, defendant testified he did not treat the assignment seriously. He filled out the worksheet "like a plot in a story" and "as a joke." His comments were not directed at Roth, and he did not think he had to hand in the worksheet after it was completed. Further, defendant denied entering Ostrem's apartment and attacking her. Finally, he expressed that he felt really upset about what he had done to Amerio and that he was very sorry for what happened.

¶ 25　　　　At the conclusion of the evidence, the State asked the trial court to sentence defendant to death. Defendant's counsel argued that such a sentence was unwarranted, noting defendant's lack of any prior criminal record and arguing he acted under the influence of his developmental reading disorder and the issues associated with that disorder. Defense counsel also argued that the evidence supported a finding that defendant could be rehabilitated. He described defendant as "immature," an "emotionally disturbed young man," "irresponsible," and argued as follows:

> "[I]t's true, [defendant], still at this stage in his life; has no idea who he is, does not behave or perform rationally. It's true that, in [defendant's] mind, what happened *** was an accident, although everybody knows it wasn't an accident, and at some time in this young man's life he'll address and recognize, assuming that he continues and reaches some emotional maturity, that it was not an accident. That testimony [from defendant], more than anything else, *** demonstrates where this young man is emotionally. He's a big kid, but he's a little boy.
>
> * * *
>
> I submit, that due to his age, 18 years old, that this young man, who had admitted the killing to Sergeant Atteberry, would assist [the police], would assist them and cooperate with them. And *** he did just that. He *** showed where his clothes

were, where the jewelry was. This is no street-wise criminal, your Honor, scheming, plotting, planning, sophistication. This is a young man inside a big man's body."

¶ 26 Ultimately, the trial court declined to impose the death penalty, finding mitigating factors sufficient to preclude the imposition of such a sentence. Instead, the court sentenced defendant to natural life in prison without the possibility of parole. In setting forth its determination, the court stated it had considered everything that had been presented to it regarding the offense at issue, matters in defendant's background, and other conduct on his part. It described the nature and the circumstances of the offense as "horrible" and "almost beyond description." The court found defendant's actions in killing Amerio were premeditated and rejected his claim that he was provoked by a confrontation with her. The court stated the confrontation defendant described "did not occur" and determined that he took his roommate's knife to Amerio's apartment "for the purpose of using it as it was used." It concluded defendant's attack on Amerio "was accompanied by and evidenced exceptionally brutal or heinous behavior, indicative of wanton cruelty." Further, the court found defendant had also attacked Ostrem and stated as follows:

"That type of conduct on the part of the Defendant indicates to the Court that we're dealing with a person here who is not just possessed on [the day of Amerio's murder] by some terrible and bizarre impulse that was momentary and that had never come before and would never occur again. I just don't believe that."

¶ 27 Defendant filed a motion to reconsider or reduce his sentence. He argued, in part, that his sentence represented a cruel and unusual punishment and that the trial court failed to give proper weight to mitigating factors, including his learning disability and his age at the time of the offense. In July 1991, the court conducted a hearing on the motion. In support of the motion, defendant's counsel argued the court incorrectly determined that defendant "presented no

opportunity for rehabilitation" when sentencing him to life in prison. He asserted evidence was presented to the court that sufficiently demonstrated defendant's rehabilitative potential. The court denied defendant's motion, stating it had "carefully" considered all the evidence presented, both in aggravation and mitigation, and that it had imposed an appropriate sentence.

¶ 28 Defendant challenged his sentence on direct appeal. He argued, in part, that the trial court abused its discretion in sentencing him to natural life given his age and lack of any criminal record. Defendant also maintained the court failed to consider mitigating factors that demonstrated he could be rehabilitated. This court affirmed defendant's conviction and sentence, noting the trial court's rejection of defendant's version of the murder and its finding that defendant had previously attacked another woman and his behavior was likely to recur. See *People v. Cortez*, No. 4-91-0547 (March 20, 1992) (unpublished order under Illinois Supreme Court Rule 23).

¶ 29 In November 2018, defendant filed a *pro se* postconviction petition alleging his natural life sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was denied the opportunity to present mitigating evidence at sentencing; his sentence did not adequately take into consideration his "[a]ge, mental state[,] or level of culpability"; and his sentence did not adequately reflect his potential for rehabilitation. Defendant cited case authority, including *Miller v. Alabama*, 567 U.S. 460 (2012), recognizing that children are constitutionally different from adults for sentencing purposes and setting forth limits on the imposition of life sentences for juvenile offenders. He argued the same principles that apply to juvenile offenders should be applied to him as a young adult. Defendant maintained that, in his case, a natural life sentence was unwarranted and unconstitutional because he (1) was only 18 years old at the time of the offense, (2) suffered from a severe learning disability, (3) was raised

in a broken home, (4) acted on an immature impulse to commit a burglary and did not intend to kill, and (5) was remorseful.

¶ 30 In February 2019, the trial court dismissed defendant's petition, finding it was patently without merit. In reaching that determination, the court noted defendant was not a juvenile at the time of the murder, his life sentence was discretionary rather than mandatory, and "the sentencing court adequately considered his youth."

¶ 31 This appeal followed.

¶ 32 II. ANALYSIS

¶ 33 On appeal, defendant challenges the trial court's first-stage dismissal of his *pro se* postconviction petition. He asserts his petition set forth at least an arguable, as-applied constitutional challenge to his natural life sentence because (1) the principles restricting life sentences for juvenile offenders should be applied to him as an 18-year-old, young adult offender and (2) his youth and its attendant characteristics were not afforded consideration at his sentencing hearing. He asks this court to reverse the dismissal of his *pro se* petition and remand for second-stage proceedings with the appointment of counsel so that he may have the opportunity to develop his claim.

¶ 34 A. The Post-Conviction Hearing Act

¶ 35 "The Post-Conviction Hearing Act [(Act) (725 ILCS 5/122-1 *et seq.* (West 2014))] provides a procedural mechanism through which criminal defendants can assert that their federal or state constitutional rights were substantially violated in their original trials or sentencing hearings." *People v. Buffer*, 2019 IL 122327, ¶ 12, 137 N.E.3d 763. The Act sets forth a three-stage process for the adjudication of a postconviction petition. *Id.* ¶ 45. At the first stage of proceedings, "the circuit court determines whether the petition is 'frivolous or is patently without

- 12 -

merit.' " *Id.* (quoting 725 ILCS 5/122-2.1(a)(2) (West 2014)). Upon making such a determination, "the court must dismiss the petition in a written order." *People v. Hodges*, 234 Ill. 2d 1, 10, 912 N.E.2d 1204, 1209 (2009).

¶ 36        A postconviction petition is frivolous or patently without merit only when it "has no arguable basis either in law or in fact." *Id.* at 11-12. "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "An example of an indisputably meritless legal theory is one which is completely contradicted by the record." *Id.* "Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 17. A court's dismissal of a postconviction petition is subject to *de novo* review. *Buffer*, 2019 IL 122327, ¶ 12.

¶ 37                              B. *Miller* and its Progeny

¶ 38        In *Miller*, 567 U.S. at 479, the Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," *i.e.*, those under the age of 18. The court relied on previous decisions establishing that children are constitutionally different from adults for sentencing purposes. *Id.* at 471 (citing *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010)). In setting forth its decision, the court stated as follows:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his

participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

¶ 39        *Miller* set forth a new substantive rule of constitutional law and has been held to apply retroactively. *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016); see also *People v. Davis*, 2014 IL 115595, ¶ 39, 6 N.E.3d 709 ("Since *Miller* declares a new substantive rule, it applies retroactively ***."). It requires "that before sentencing a juvenile to life without parole, the sentencing judge take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ____, 136 S. Ct. at 733.

"The [*Miller*] Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of children's diminished culpability and heightened capacity for change, *Miller* made clear that appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (Internal quotation marks omitted.) *Id.* at___, 136 S. Ct. at 733-34.

In Illinois, *Miller*'s holding and rationale have been extended to cases in which juvenile offenders are sentenced to *de facto* mandatory life sentences, *i.e.*, sentences greater than 40 years (*People v. Reyes*, 2016 IL 119271, ¶ 9, 63 N.E.3d 884; *Buffer*, 2019 IL 122327, ¶¶ 41-42), and "to

discretionary sentences of life without parole" (*People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849).

¶ 40　　　　Ultimately, to establish a *Miller*-based claim, "a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27. Further, in *Holman*, 2017 IL 120655, ¶¶ 40, 46-47, the supreme court considered "what it means to apply *Miller*," stating as follows:

　　　　"Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. [Citation.]

　　　　*** In revisiting a juvenile defendant's life without parole sentence, the

- 15 -

only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing."

¶ 41                    C. Application of *Miller* to Young Adult Offenders

¶ 42          Although *Miller* and its progeny directly apply to only offenders under the age of 18, our supreme court has recognized that young adult offenders "may raise an as-applied constitutional challenge in a postconviction petition based on the evolving science on juvenile maturity and brain development which helped form the basis of the *Miller* decision." *People v. Moore*, 2020 IL App (4th) 190528, ¶ 37 (citing *People v. Harris*, 2018 IL 121932, ¶¶ 46, 48, 120 N.E.3d 900; *People v. Thompson*, 2015 IL 118151, ¶ 44, 43 N.E.3d 984).

"In doing so, the court opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 43          Specifically, in *Thompson*, 2015 IL 118151, ¶¶ 4-7, the defendant received a mandatory natural life sentence after committing two murders at the age of 19. Many years after his conviction, he raised an as-applied constitutional challenge to his mandatory life sentence under *Miller* while appealing the dismissal of a section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2010)). *Thompson*, 2015 IL 118151, ¶¶ 16-17. On review, the supreme

court found the defendant's as-applied challenge had been forfeited because it was raised for the first time on appeal. *Id.* ¶ 39.

¶ 44 In reaching that decision, the supreme court noted that as-applied constitutional challenges were "dependent on the particular circumstances and facts of the individual defendant or petitioner" and, as a result, it was "paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* ¶ 37. The court further reasoned as follows:

> "To support his as-applied challenge, defendant relies exclusively on the 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision to ban mandatory natural life sentences for minors. Defendant maintains that this science applies with 'equal force' to a criminal defendant who was between the ages of 18 and 21 when the underlying crime was committed. The record here, however, contains nothing about how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge. Nor does the record contain any factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18. Undoubtedly, the trial court is the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge in this case." *Id.* ¶ 38.

¶ 45 The supreme court went on to state that, despite its ruling, the defendant was "not necessarily foreclosed from renewing his as-applied challenge in the circuit court." *Id.* ¶ 44. In particular, it noted that the Act was "expressly designed to resolve constitutional issues." *Id.* More recently, the supreme court reached a similar conclusion in *Harris*, 2018 IL 121932, ¶¶ 39-48,

where it determined the defendant's *Miller*-based, as-applied challenge to his mandatory minimum aggregate term of 76 years' imprisonment—for offenses he committed at the age of 18—could not be raised for the first time on direct appeal and would be more appropriately raised in a postconviction petition.

¶ 46                     D. Defendant's *Miller*-Based Postconviction Claim

¶ 47        The above case authority makes clear that to establish an as-applied constitutional challenge to his or her life sentence based on *Miller* principles, a young adult offender is required to allege and ultimately demonstrate that (1) at the time of the commission of the underlying offense, his or her own specific characteristics—those related to youth, level of maturity, and brain development—placed him or her in the same category as juvenile offenders described in *Miller* and (2) his or her sentencing was not *Miller* compliant, in that a life sentence was imposed without regard for the offender's youth and its attendant characteristics. Further, as discussed, a defendant must present a claim that has an arguable basis in law and fact to survive the first stage of postconviction proceedings.

¶ 48        Initially, we note the State's contention on appeal that, in *Harris*, the supreme court "made it clear that *Miller* and its progeny provide no support for adult offenders" and, as a result, defendant's postconviction petition was based on a meritless legal theory and properly dismissed. However, the portions of *Harris* referenced by the State concern its consideration and rejection of the defendant's *facial* constitutional challenge to his sentence. *Id.* ¶¶ 50-61. This case, however, involves an *as-applied* constitutional challenge. As set forth above, the supreme court has clearly indicated a young adult offender may bring an as-applied challenge to his or her sentence based on *Miller* in a postconviction petition. See *Moore*, 2020 IL App (4th) 190528, ¶ 37; *Harris*, 2018 IL 121932, ¶¶ 46, 48; *Thompson*, 2015 IL 118151, ¶ 44. Accordingly, this portion of the State's

argument lacks merit.

¶ 49 In his *pro se* postconviction petition, defendant argued that given his youth and specific characteristics, he was like a juvenile offender. He asserted, however, that he was denied the opportunity to present mitigating evidence at his sentencing and suggested the sentencing court failed to consider his age, mental state, level of culpability, or potential for rehabilitation before sentencing him to natural life in prison. Defendant maintained that factors supporting leniency included that he (1) was only 18 years old at the time of the murder, (2) suffered from a severe learning disability, (3) was raised in a broken home, (4) acted on an immature impulse to commit a burglary and did not intend to kill his victim, and (5) was remorseful.

¶ 50 Here, we find that, even assuming defendant can show that *Miller* and its progeny should apply to him as a young adult offender (or at the very least present an arguable claim as to such), it is not arguable that his sentencing hearing failed to comply with *Miller*. In other words, the record aptly demonstrates that the trial court engaged in *Miller*-related considerations before sentencing defendant to natural life in prison. See *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 32 ("[E]ven assuming [the] defendant could establish that *Miller* principles extended to him, where he committed the murder at the still youthful age of 19, the record *** demonstrates that his sentencing hearing was *Miller*-compliant.").

¶ 51 To begin with, defendant's claim that he was not permitted to present mitigating evidence at his sentencing is plainly refuted by the record. His sentencing hearing was conducted over a period of three days, during which both parties presented a significant amount of evidence. Not only did defendant testify on his own behalf, he presented mitigating evidence in the form of testimony from family members, friends, a previous work supervisor, a former teacher, a psychiatrist, and an addictions counselor.

¶ 52 Further, defendant's evidence contained information pertinent to *Miller*-related factors. As set forth in *Holman*, compliance with *Miller* requires a sentencing court to consider factors related to a defendant's youth and its attendant characteristics before sentencing a youthful offender to a discretionary life sentence. *Holman*, 2017 IL 120655, ¶ 46. Relevant youth-related factors for consideration include the following:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

¶ 53 In this case, evidence was presented showing defendant's age, family background, education, and interactions with peers. The psychiatrist defendant presented testified that he considered defendant to be an "adolescent" and that defendant appeared remorseful for his crime. He also testified defendant suffered from a developmental reading disorder that resulted in emotional immaturity. The addictions counselor opined defendant had impaired emotional and mental development as a result of his substance abuse. He estimated defendant's emotional development to "be about the age of 14 or 15." Defendant's former teacher described defendant as "[s]ometimes very childish" and "very immature for the age that he was in school." She also stated he exercised "poor judgment" and acted "impulsively." Further, defendant's own testimony set forth his version of the murder as unintentional.

¶ 54    On appeal, defendant acknowledges that "the record of his sentencing hearing contains significant evidence as to" the factors set forth in *Holman*. However, he maintains the trial court did not "afford [that] evidence any consideration." In particular, he notes his sentencing occurred "long before the law recognized the diminished capacity of juvenile and young offenders" and that the court made no explicit reference to his youth. Defendant also cites authority for the proposition that the mere fact that the sentencing court heard evidence in mitigation and broadly stated it considered the evidence presented was not enough to demonstrate *Miller* compliance. See *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13 (holding "that the [sentencing] court's mere awareness of a defendant's age and consideration of a PSI does not provide evidence that [it] specifically considered [the] defendant's youth and its attendant characteristics"); *Buffer*, 2019 IL 122327, ¶ 46 (finding a lack of compliance with *Miller* where "the circuit court stated that it 'considered all of the relevant statutory requirements,' " but the record did "not indicate that the court considered [the] defendant's youth and its attendant characteristics").

¶ 55    We note that in cases like the one at bar, "inquiry into the *Miller* factors is backwards-looking." *Holman*, 2017 IL 120655, ¶ 47. "In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case." *Id.* In *Holman*, the supreme court determined the defendant's sentence passed constitutional muster under *Miller* where the record contained "some evidence related to the *Miller* factors" and reflected a determination by the sentencing court that the defendant's conduct placed him beyond rehabilitation. *Id.* ¶ 50. In describing the evidence considered at the defendant's sentencing, the court states as follows:

"In announcing the defendant's sentence, the trial court explicitly stated that

- 21 -

it considered the trial evidence and the PSI, as well as the evidence and arguments from the sentencing hearing. The trial court knew the defendant was 17 at the time of the offense, and the prosecutor and the defendant's attorney both highlighted his age in their arguments at the sentencing hearing." *Id.* ¶ 48.

The court went on to detail evidence contained within the defendant's PSI as it pertained to *Miller* considerations. *Id.*

¶ 56 We find the present case similar to *Holman*. A youthful offender's sentence does not run afoul of *Miller* simply because it predates that decision. Additionally, here, not only did the trial court explicitly state it had considered and relied on the evidence presented, specifically including mitigating evidence, in declining to impose the death penalty, the record reflects that defendant's youth and immaturity were prominently featured in both the mitigating evidence defendant presented at sentencing and his counsel's arguments to the court. This focus, in particular, distinguishes the present case from the authority defendant cites where the record showed only a general "awareness" of the evidence presented or consideration of "statutory requirements." In light of the emphasis at defendant's sentencing on evidence related to his youth and immaturity, we find it illogical for defendant to now argue that the court gave such evidence absolutely no consideration.

¶ 57 Significantly, like in *Holman*, the record further reflects a determination by the trial court that defendant's conduct showed he was beyond the possibility of rehabilitation.

> "[A] juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after

considering the defendant's youth and its attendant characteristics." *Id.* ¶ 46. When imposing defendant's sentence, the court described the nature and the circumstances of the offense as "horrible" and "almost beyond description." It explicitly rejected defendant's version of the offense, which defendant points to on appeal as further evidence of his immaturity and impetuosity, finding, instead, that Amerio's murder was premeditated and unprovoked. Notably, the court also found defendant had attacked Ostrem in her apartment only a few weeks before Amerio's murder, indicating the behavior that led to Amerio's murder was not an aberration and was likely to recur. Finally, we note that in ruling on defendant's motion to reconsider his sentence, the court rejected an argument by defendant's counsel that it had incorrectly determined defendant lacked rehabilitative potential, stating it had carefully considered all the evidence presented and imposed an appropriate sentence.

¶ 58    Ultimately, the court's comments indicate it placed defendant in the same category as juvenile offenders whose "conduct show[s] irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" such that they may be sentenced to life in prison. See *id.*; see also *People v. Croft*, 2018 IL App (1st) 150043, ¶ 31, 100 N.E.3d 577 (finding the sentencing court provided "a clear indication that [it] believed [the] defendant to be incorrigible" where the court described the offense as being " 'as heinous a murder as one can imagine' " and the defendant as having " 'evil intentions' " and being " 'absolutely heartless' " and " 'almost inhuman' "); *Carrion*, 2020 IL App (1st) 171001, ¶ 33 ("[T]he trial court's comments suggested it believed [the] defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation given that defendant denied responsibility for the murder even at trial and declined to address the murdered victim's family.").

¶ 59        Again, under the facts of this case, we find it unquestionable that defendant's sentencing hearing was *Miller*-compliant. Thus, even assuming that defendant could establish *Miller*'s applicability to him as an 18-year-old young adult offender, his ultimate as-applied constitutional challenge must fail.

¶ 60        In so holding, we recognize at least two First District cases that have held that the applicability of *Miller* and its progeny to a young adult offender must be firmly established before any consideration of whether his or her underlying sentencing proceedings were *Miller*-compliant. See *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 47 (stating the young adult offender in that case was required to "make a preliminary showing" that *Miller* applies in the first place before a court may undertake a *Holman* analysis); *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 20 ("[The defendant] has to make a preliminary showing before the court undertakes a *Holman* analysis.").

¶ 61        In *Ruiz*, the First District relied on *Harris* for the proposition that "young adult defendants are not entitled to a presumption that *Miller* applies to them." *Ruiz*, 2020 IL App (1st) 163145, ¶ 52. Accordingly, the court held that "when young adults raise claims that the *Miller* line of cases applies to them," supreme court precedent, namely *Harris*, requires the defendant to first plead and prove "that his or her individual characteristics require the application of *Miller*." *Id.* It stated that "if, and only if, the young adult makes this showing" was a court permitted "to consider whether the initial sentencing hearing complied with *Miller*" as outlined in *Holman*. *Id.* The court further reasoned as follows:

        "As *Harris* instructs, young adult defendants are not entitled to make an as-
        applied challenge to their sentences under *Miller* unless they first show that *Miller*
        applies to them. [Citation.] If our supreme court conceptualized [otherwise], then
        much of the analysis in *Harris* makes no sense—the court would have just assumed

- 24 -

*Miller* applied to the defendant and evaluated his initial sentencing hearing. Of course, the court did not do that. *** The trial court should determine the applicability of *Miller*, as a factual matter, in the first instance." *Id.* ¶ 54.

In *Johnson*, 2020 IL App (1st) 171362, ¶¶ 20-27, the First District set forth precisely the same analysis.

¶ 62        Ultimately, we disagree with the interpretation of *Harris* in both *Ruiz* and *Johnson*. Clearly, in *Harris*, 2018 IL 121932, ¶ 45, the supreme court held that "[b]ecause [the] defendant was an adult, *Miller* d[id] not apply directly to his circumstances." Accordingly, to establish the defendant's as-applied constitutional challenge, a record had to be developed with respect to his claim that *Miller* was even applicable. *Id.* Such a determination could not be made by the court on review because an adequate record as to that specific claim had not been developed in the trial court. *Id.* ¶¶ 45-46.

¶ 63        Notably, however, the sentence at issue in *Harris* was a *mandatory* minimum sentence of 76 years in prison. *Id.* ¶¶ 37-48; see also *Thompson*, 2015 IL 118151, ¶¶ 4-7 (applying a similar analysis to *Harris* and involving a defendant sentenced to a *mandatory* natural life sentence). Accordingly, the defendant's as-applied constitutional challenge based on *Miller* rose and fell with his assertion that a *Miller* analysis applied to him as a young adult offender. This is so because when dealing with a mandatory life sentence or a mandatory *de facto* life sentence, the trial court simply has no ability to impose a less harsh sentence based on considerations of youth and its accompanying characteristics. Thus, whether *Miller* factors were presented and considered at a defendant's sentencing would do nothing to refute a defendant's as-applied challenge.

¶ 64        The same is not true when—like in this case and in *Holman*—a discretionary life sentence is imposed. When the sentence is discretionary, there remains the possibility that the

sentence was in compliance with the dictates of *Miller*. In this case, the record was sufficiently developed for us to review what occurred at defendant's sentencing hearing and determine that it was in compliance with *Miller*, contradicting defendant's postconviction claims. In such circumstances, it would be pointless and a waste of judicial resources to ignore the deficiency in defendant's argument that his sentencing was *Miller*-noncompliant and, instead, order a remand for further postconviction proceedings. The First District's holdings in *Ruiz* and *Johnson* ignore the critical fact in *Harris* of the mandatory nature of the defendant's sentence, and we decline to follow their analysis.

¶ 65                                III. CONCLUSION

¶ 66            For the reasons stated, we affirm the trial court's judgment.

¶ 67            Affirmed.

**No. 4-19-0158**

| | |
|---|---|
| **Cite as:** | *People v. Cortez*, 2021 IL App (4th) 190158 |
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 90-CF-1405; the Hon. Jason M. Bohm, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher Kopacz, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |