2022 IL App (2d) 210488
No. 2-21-0488
Opinion filed July 18, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-654 |
| JOSE M. GARCIA, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Jose M. Garcia, appeals from the summary dismissal of his petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) for relief from his first-degree murder conviction (720 ILCS 5/9-1(a)(1) (West 2012)) in connection with the shooting death of Gabriel Gonzalez. Defendant's petition claimed that the trial court imposed a *de facto* life sentence that was unconstitutional based on his youth and developmental status at the time of the offense. We reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant's conviction followed a February 2014 jury trial where the evidence established that defendant fatally shot the victim outside a liquor store on March 10, 2013. The shooting was

evidently connected to a gang-related dispute. Defendant, born on December 21, 1994, was 18 years old at the time of the offense. The trial court sentenced defendant in April 2014 to an aggregate 62-year prison term: 37 years for the murder (730 ILCS 5/5-4.5-20(a) (West 2012)) plus a mandatory 25-year add-on sentence because defendant personally fired the shot that caused Gonzalez's death (*id.* § 5-8-1(d)(iii)).

¶ 4    According to the presentence investigation report (PSI), defendant had an extensive juvenile delinquency history, including adjudications for defacing school property, aggravated assault, criminal trespass to residence, consumption of alcohol by a minor, and resisting/obstructing an officer. Defendant (1) had spent time in juvenile correctional facilities, (2) had learning disabilities and received special education services, and (3) had a history of misbehavior in school. Although he did not finish high school, he earned a graduate equivalency degree (GED) while incarcerated. He became a gang member at 17 after being released from juvenile detention, although he may have had some form of prior gang affiliation. Defendant reported mental health issues, including depression and anger management problems. Defendant lived with both of his parents. His parents argued, but there was no physical abuse between them. However, defendant got into physical altercations with his father on several occasions. The PSI reflected that, in 2008, defendant received a "Psycho-Educational/Emotional [E]valuation," which revealed that he had a borderline IQ, suffered mild symptoms of depression, was prone to angry outbursts, had an impulsive nature, was fearful of social rejection, and was easily provoked.

¶ 5    After hearing other evidence in aggravation and mitigation, which we need not recount here, the trial court imposed the aggregate 62-year prison sentence. The court stated that it had considered the PSI and all evidence in aggravation and mitigation. The court noted defendant's history of delinquency and gang involvement. The court acknowledged that another individual

started the argument that led to the shooting but stressed that defendant took the conflict to a new level by bringing a gun and shooting the victim. The court also observed that defendant fired multiple shots, only one of which struck the victim; the missed shots endangered others nearby. The court mentioned defendant's problems in school but remarked that, by earning a GED in jail, defendant had shown that he could "make a choice that is productive and healthy." The court emphasized that the crime was gang-related and stressed the need to impose a sentence that would deter others from committing similar crimes. The court concluded by noting that defendant's actions showed that he did not value human life. Defendant moved for reconsideration of his sentence. In denying the motion, the court noted that, in imposing his sentence, it had considered defendant's youth and potential for rehabilitation.

¶ 6    In April 2021, defendant, through counsel, filed his petition under the Act, claiming that his sentence was a *de facto* life sentence that violated the eighth amendment to the United States Constitution (U.S. Const., amend VIII) as interpreted by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. As discussed below, *Miller* placed limitations on the imposition of life sentences without parole for offenses committed by those under 18. *Id.* at 479. Although defendant was 18 years old when he killed the victim here, he cited *People v. Ruiz*, 2020 IL App (1st) 163145, and *People v. Johnson*, 2020 IL App (1st) 171362, for the proposition that a young adult may pursue an eighth amendment challenge under *Miller* to a life sentence without parole.

¶ 7    Along with his petition, defendant submitted a report from James Garbarino, Ph.D., a developmental psychologist. Garbarino explained that the immaturity of the adolescent brain extends into early adulthood and includes the frontal lobes, which "play a crucial role in making good decisions, controlling impulses, focusing attention for planning, and managing emotions."

According to Garbarino, the maturation process involves the brain's white matter, gray matter, and neurotransmitters, all of which "are compromised in an individual under the age of 25." In addition, social conditions affect the development of white matter, so certain youths "suffer both from the general limitations of unformed brains *and* the disadvantaged functioning that arises from their adverse childhood experiences." (Emphasis in original). Garbarino added that "the hormonal conditions of such youths contribute to impaired brain function (relative to adults) in matters of assessing and taking risks, emotional intensity, and dealing with peers (including social rejection)." Based not on a clinical assessment but only on a review of documents concerning defendant's social history, Garbarino concluded:

> "[Defendant] appears to be the embodiment of the developmental issues that constitute the focal points of the Supreme Court's decision in *Miller v. Alabama* \*\*\*. As an 18[-]year old youth, he demonstrated immaturity of thought and emotional control, impetuous and impulsive action, and failure to appreciate the full consequences of his criminal behavior. He came out of a family and home environment that was toxic and developmentally damaging because of abuse and abandonment. He lived in community settings that exacerbated rather than compensated for the traumatic features of his home life. And, perhaps most importantly, the possibility of rehabilitation was present at the time of his crime and sentencing."

The trial court summarily dismissed the petition, and this appeal followed.

¶ 8                                    II. ANALYSIS

¶ 9     We begin with a summary of the relevant principles governing proceedings under the Act. Our supreme court has stated as follows:

"The Act [citation] provides a remedy for incarcerated defendants who have suffered a substantial violation of their constitutional rights at trial. Under the Act, a postconviction proceeding contains three stages. At the first stage, the circuit court must independently review the postconviction petition, without input from the State, and determine whether it is 'frivolous or is patently without merit.' [Citation.] If the court makes this determination, the court must dismiss the petition in a written order. [Citation.] If the petition is not dismissed, the proceedings move to the second stage. [Citation.]

At the second stage, counsel is appointed to represent the defendant, if he is indigent [citation], and the State is permitted to file responsive pleadings [citation]. The circuit court must determine at this stage whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. [Citation.] If no such showing is made, the petition is dismissed. If, however, the petition sets forth a substantial showing of a constitutional violation, it is advanced to the third stage, where the circuit court conducts an evidentiary hearing [citation]." *People v. Johnson*, 2018 IL 122227, ¶¶ 14-15.

¶ 10    This appeal arises from the first-stage summary dismissal of defendant's petition. At the first stage of postconviction review, the petition's allegations must be liberally construed and taken as true. *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit and will be summarily dismissed at the first stage if it has no arguable basis either in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). This is the case when the petition "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "An example of an indisputably meritless legal theory is one which is completely contradicted by the record." *Id.* "Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 17. We review *de novo* a first-stage dismissal. *People v. Barghouti*, 2013 IL App (1st) 112373, ¶ 13.

¶ 11    In *Miller*, 567 U.S. at 479, the Supreme Court held that a sentencing scheme that mandates a life sentence without parole for crimes committed by a juvenile (*i.e.*, one under the age of 18) violates the eighth amendment. In *People v. Holman*, 2017 IL 120655, our supreme court considered the applicability of *Miller* to discretionary life sentences imposed on juveniles. The *Holman* court held that the eighth amendment does not categorically forbid discretionary life sentences without parole for juveniles, but before imposing such a sentence, the court must "determine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. In making the determination, the trial court must consider "the defendant's youth and its attendant characteristics" (*id.*) as identified in *Miller*.

> "Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* (citing *Miller*, 567 U.S. at 477-78).

¶ 12    In *People v. Buffer*, 2019 IL 122327, ¶ 27, the supreme court held that *Miller* applies to any life sentence for a juvenile, whether "mandatory or discretionary, natural or *de facto*." The *Buffer* court determined that a sentence of more than 40 years is a *de facto* life sentence. *Id.* ¶ 41. In *People v. Harris*, 2018 IL 121932, ¶¶ 60-61, our supreme court declined to extend *Miller*'s eighth amendment protections to all offenders under age 21, noting that the Supreme Court was

clear that age 18 was the dividing line between juveniles and adults for purposes of eighth amendment protections.

¶ 13    However, as the First District noted in *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 87, the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) is an alternative vehicle for sentencing challenges based on *Miller*'s concerns about the immaturity of young offenders. The *Wilson* court observed:

> "In recent years, *** our supreme court has acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause [citation]." *Wilson*, 2022 IL App (1st) 192048, ¶ 87.

The *Wilson* court cited *People v. House*, 2021 IL 125124, ¶¶ 29, 32, *Harris*, 2018 IL 121932, ¶ 48, and *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44. *Wilson*, 2022 IL App (1st) 192048, ¶¶ 87-88.

¶ 14    The proportionate-penalties clause states that a court must determine all penalties based on the "seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To succeed on a proportionate-penalties claim, the defendant must show that his sentence "is so disproportionate to the offense as to violate the constitution." *People v. Howard*, 2021 IL App (2d) 190695, ¶ 40. Stated differently, "[t]he proportionate penalties clause is implicated when a defendant's sentence is cruel, degrading, or so wholly disproportionate to the offense so as to shock the moral conscience of the community." *People v. Benford*, 2021 IL App (1st) 181237, ¶ 12. In recognizing the possibility of a proportionate-penalties claim based on the concerns articulated in *Miller*, our supreme court has (as one appellate court noted) accepted

"the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27.

¶ 15      In *People v. Cortez*, 2021 IL App (4th) 190158, ¶ 47, the court elaborated on the elements of a proportionate-penalties claim based on *Miller* concerns:

"[T]o establish an as-applied constitutional challenge to his or her life sentence based on *Miller* principles, a young adult offender is required to allege and ultimately demonstrate that (1) at the time of the commission of the underlying offense, his or her own specific characteristics—those related to youth, level of maturity, and brain development—placed him or her in the same category as juvenile offenders described in *Miller* and (2) his or her sentencing was not *Miller* compliant, in that a life sentence was imposed without regard for the offender's youth and its attendant characteristics. Further, as discussed, a defendant must present a claim that has an arguable basis in law and fact to survive the first stage of postconviction proceedings."

¶ 16      With these principles in mind, we consider whether the trial court erred in summarily dismissing defendant's postconviction petition. The State argues that our decision in *People v. Mauricio*, 2021 IL App (2d) 190619, dictates that we affirm the trial court's decision. *Mauricio* was a direct appeal from the defendant's conviction for first-degree murder and the resultant 55-year prison sentence. We rejected the defendant's argument that a young adult can challenge his sentence under the eighth amendment as construed in *Miller*. *Id.* ¶¶ 20-24. The defendant also made a proportionate-penalties challenge, which we rejected based on the seriousness of the

offense (the trial court had found exceptionally brutal and heinous behavior indicative of wanton cruelty) and other aggravating and mitigating factors. *Id.* ¶ 29. We rendered no opinion on whether the proportionate-penalties clause might require the application of the *Miller* safeguards in cases involving young adults whose developmental characteristics are in the juvenile category. Nor did the occasion seem to call for such an opinion. While Garbarino's testimony at the sentencing hearing in *Mauricio* "particularly focused on defendant's traumatic childhood experiences and how those experiences may have impacted defendant" (*id.* ¶ 7), his testimony did not appear to establish that, from a developmental standpoint, the defendant had the characteristics of a juvenile.[1]

¶ 17 We also note that defendant's petition framed his claim as falling under the eighth amendment rather than the proportionate-penalties clause—a defect noted by the trial court in its dismissal order. Nevertheless, the petition cited cases raising proportionate-penalties claims based on *Miller* (*e.g.*, *Ruiz*, 2020 IL App (1st) 163145). Under these circumstances, the failure to identify

---

[1]In *Howard*, the defendant's proportionate-penalties clause claim was similarly flawed. The defendant's claim was essentially that the trial court did not adequately consider defendant's youth; hence, in our view, it was a nonconstitutional abuse-of-discretion claim not cognizable in a postconviction petition. *Howard*, 2021 IL App (2d) 190695, ¶ 40. In *Howard*, as in *Mauricio*, the defendant had not made a sufficient showing based on his individual circumstances that he was entitled to the *Miller* protections as a young adult. *Id.* ¶¶ 46-47. We do not read either *Mauricio* or *Howard* to categorically foreclose *Miller*-based proportionate-penalties challenges in appropriate cases.

the correct constitutional provision is not a sufficiently serious defect to justify summary dismissal of the petition.

¶ 18 Garbarino's report was sufficient to substantiate that the 18-year-old defendant was developmentally equivalent to a juvenile and thus entitled, under the proportionate-penalties clause, to the *Miller* safeguards afforded to juveniles. The question, then, is whether defendant received a *Miller*-compliant sentencing hearing that would support a *de facto* life sentence. We conclude that he did not.

¶ 19 Defendant committed a heinous crime. However, the trial court did not find that defendant showed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Indeed, there was significant evidence to suggest that defendant was not so. He was of borderline intelligence and fearful of social rejection, which made him vulnerable to gang pressure. He also displayed, according to Garbarino, "impetuous and impulsive action." While we presume that the court considered this evidence (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 22), we note that the sentencing hearing predated *Holman* and the cases applying *Miller* (via the proportionate-penalties clause) to young adults. Accordingly, the court was unaware that imposing a *de facto* life sentence requires a finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Of course, this explains, but does not excuse, the absence of such a finding.[2]

---

[2]Notably, some pre-*Miller* sentencing hearings have been found *Miller*-compliant. *People v. Carrion*, 2020 IL App (1st) 171001, is an example, but that case is readily distinguishable because "the trial court's comments [at sentencing] suggested it believed defendant's conduct

¶ 20    We recognize that in *Jones v. Mississippi*, 593 U.S. ___, ___,141 S. Ct. 1307, 1321 (2021), the Supreme Court held that *Miller* does not require an express or implied finding of incorrigibility when the trial court imposes a discretionary sentence of life without parole. Subsequently, our supreme court commented in *People v. Dorsey*, 2021 IL 123010, ¶ 41, that *Jones* calls into question *Holman*'s extension of *Miller* to discretionary life-without-parole sentences. However, "[u]nless and until explicit direction is given in light of *Jones*, we are constrained to follow our current supreme court precedent." *People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 22 n.2.

¶ 21    In summary, we conclude that defendant made a sufficient showing that, based on evolving neuroscience, societal standards, and defendant's youthful characteristics, he was developmentally equivalent to a juvenile at the time of the offense.[3] We further conclude that the record does not establish that defendant received a *Miller*-compliant sentencing hearing. Accordingly, defendant's petition was neither frivolous nor patently without merit.

---

showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 33. The trial court here made no remarks that can be construed in that manner.

[3]In doing so, we recognize that Garbarino's report paints a somewhat different picture of defendant's home life and upbringing than the PSI does. Notably, the PSI does not reflect that defendant "came out of a family and home environment that was toxic and developmentally damaging because of abuse and abandonment" as Garbarino's report concludes. Whether Garbarino is correct in his assessment of defendant's social environment and developmental status is a matter for a later determination. We hold only that defendant has made a sufficient showing to withstand summary dismissal of his petition.

¶ 22                                  III. CONCLUSION

¶ 23     For the foregoing reasons, we reverse the judgment of the circuit court of Lake County summarily dismissing defendant's postconviction petition. We remand with instructions to docket the petition for further proceedings under the Act.

¶ 24     Reversed and remanded.

_People v. Garcia_, 2022 IL App (2d) 210488

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 13-CF-654; the Hon. Daniel B. Shanes, Judge, presiding. |
| **Attorneys for Appellant:** | Thomas C. Brandstrader, of Highwood, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Mary Beth Burns, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |