# Illinois Official Reports

## Appellate Court

---

## *People v. Ruiz*, 2020 IL App (1st) 163145

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ISRAEL RUIZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-16-3145 |
| Filed | May 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 98-CR-31306; the Hon. Thomas Joseph Hennelly, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Walker concurred in the judgment and opinion.<br>Justice Pierce dissented, with opinion. |

**OPINION**

¶ 1        Israel Ruiz and Omar Johnson, whose separate appeal we also decide today (see *People v. Johnson*, 2020 IL App (1st) 171362), were convicted of violent murders they committed at the ages of 18 and 19, respectively. Both availed themselves of their constitutional right to a direct appeal and their statutory right to postconviction proceedings. Both come before us from the denial of leave to file a successive postconviction petition. Both petitions claim that a long line of cases expanding constitutional protections in juvenile sentencing proceedings—commonly referred to by the flagship case, *Miller v. Alabama*, 567 U.S. 460 (2012)—apply to them as young adults. Their petitions, and their counsel on appeal, urge that we account for the emerging consensus that the development of the brain continues well beyond 18 years, the arbitrarily demarcated admittance to adulthood for individuals arrested and entering our criminal law system. We hold, in both cases, that Ruiz and Johnson have made *prima facie* showings in their pleadings that evolving understandings of the brain psychology of young adults require that *Miller* apply to them.

¶ 2        Here, we reverse the trial court's denial of Ruiz's request for leave to file his successive petition and remand for further postconviction proceedings so he can develop his claim. We do the same in *Johnson*, 2020 IL App (1st) 171362.

¶ 3        At the outset, we make two critical points. Neither decision should be read to minimize or excuse the suffering wrought by the taking of another life. Indeed, *Miller* engages constitutional protections to young people who commit the most heinous type of offenses. There, the defendants committed similarly violent murders. One defendant participated in the attempted robbery of a video store, during which the clerk was shot point blank with a sawed-off shotgun. The other defendant robbed a neighbor of $300 and repeatedly hit the victim with a baseball bat saying, "I am God, I've come to take your life," before setting fire to the victim's trailer with the victim alive inside. (Internal quotation marks omitted.) *Miller*, 567 U.S. at 465-68.

¶ 4        Our decisions also should not be overread in terms of the relief we provide to Ruiz and Johnson. Both petitions were dismissed at an early stage in the successive postconviction process. We order the petitions proceed so they can attempt to show that *Miller* applies to them, as they have sufficiently pled in their petitions. If, and only if, they succeed, the trial court will consider a new sentencing hearing.

¶ 5        With those understandings, we proceed to our analysis.

BACKGROUND

¶ 6

¶ 7        *People v. Ruiz*, 2014 IL App (1st) 112993-U, ¶¶ 4-13, the appeal from the second-stage dismissal of Ruiz's initial postconviction petition, sets out the trial court proceedings in substantial detail. We reiterate facts that give context to Ruiz's claims of actual innocence and ineffective assistance of counsel.

¶ 8        On November 7, 1998, Roy Billups was helping his friend, Brian Ellison, move into Ellison's new apartment. At about 8:30 p.m., as they assembled beds in a second-story room, Billups looked out the window on 90th Street. He saw two Hispanic men walking, one of them bald except for a ponytail "hanging in the back." The two men stood on the corner; Billups kept his attention there because the man with the ponytail had his hand by his waist "toward

the belt buckle at the front of his pants." Billups identified this man as Ruiz and the man next to him as codefendant, Michael Mejia.

¶ 9        Billups watched as Ruiz and Mejia walked 30 to 40 feet west on 90th Street, coming to a stop in front of a garage on the south side of the street. Billups saw Ruiz, who was facing north, "pull[ ] out a gun and start[ ] shooting." Ruiz shot "8 or 9" times. Ruiz and Mejia turned and ran south down the alley. Later that night, Billups went to the police station and identified Ruiz and Mejia as the men involved in the shooting. Ellison gave substantially similar testimony, including identifying Ruiz as the shooter, both at the police station shortly after the offense and in court.

¶ 10       Jose Ortiz lived nearby. While watching a movie at about 8:30 p.m., he "heard several shots that sounded like they came from the rear of the house," leading him to look out the kitchen window. That window overlooked the alley behind his house. Ortiz saw a sports utility vehicle (SUV) reversing north in the alley and heard a second series of shots. Then, he saw two people walking south down the alley and noticed "something similar to a gun, a shiny, chrome gun that somebody was walking with on the side of their body." The person carrying the gun "had sort of a bald head."

¶ 11       After watching the SUV drive away, Ortiz went to join a crowd gathering on 90th Street. There, he saw a man (Nathaniel Walls) on the ground with a child in his arms. Ortiz found a police officer and reported what he saw. Sometime later, he went to the police station and viewed a lineup. He identified Ruiz as a person who "resembled the person that [Ortiz] saw in the alley." On cross-examination, Ortiz admitted to uncertainty regarding whether the person he saw was carrying a gun, and that he "didn't get a full picture of their face[s]." He identified Ruiz based on his "shirt, bald head, and his stature."

¶ 12       The State also presented witnesses from inside the SUV. See *id.* ¶¶ 6-7. These witnesses testified that after hearing gunshots, they saw Ruiz and Mejia run through the alley to the waiting SUV. Araceli Garcia testified that Mejia said G.D.s (member of the Gangster Disciples) shot at them. Vanessa Rios testified, through the transcripts from her grand jury testimony, that Ruiz threw a gun out the window after they drove off.

¶ 13       Officers on patrol saw the SUV move slowly in the alley, toward 91st Street, with its lights off. A woman inside the SUV leaned out of the window and said, "them black G.D.'s over there were just shooting at us." The officers pulled over the SUV. As they walked up, someone threw a gun out, and the SUV drove a bit further before a final stop. After hearing a radio transmission describing the shooting suspects, officers took Ruiz to the scene where he was identified. Later, at the police station, three witnesses, including Billups and Jose Ortiz, identified Ruiz in a lineup as the shooter.

¶ 14       Ruiz also gave a statement to Assistant State's Attorney Paul Quinn. Ruiz admitted to belonging to the Latin Counts street gang. Ruiz stated that his friend, Christopher Anderson, "had been shot on Halloween Night in the face by rival gang members." On November 7, 1998, after driving around in the SUV for a while, he and Mejia went for a walk. As they came toward Commercial Avenue, "the dividing line between the territory of the Latin Counts and Gangster Disciples," Ruiz saw three black teenagers across the street "dressed all in black." Ruiz did not see a gun, but they "started whistling and running around and *** one of them started going down a gangway." Mejia gave Ruiz "a 45 handgun." Ruiz "raised it with his right hand and pointed it at the teenagers across the street and fired several shots at them." Then he ran.

¶ 15    Forensic technicians matched the gun officers had seen thrown from the SUV to the gun that shot Nathaniel Walls. Although some of the fingerprints on the gun were suitable for comparison, none matched Ruiz's. The State presented no other physical evidence linking Ruiz to the shooting.

¶ 16    A jury found Ruiz guilty of first degree murder of Walls and aggravated discharge of a firearm as to Walls's child.

¶ 17    At sentencing, two officers testified about offenses for which Ruiz had been arrested. The State argued that Ruiz shot Walls as an "act of retaliation." And that, despite his upbringing, Ruiz "chose to take a path that would lead to bloodshed and violence." The State argued that Ruiz had not taken advantage of the juvenile system that tried to rehabilitate him. In response, Ruiz's counsel argued that he had a supportive family and goals to complete his education. Counsel urged the court "not to put him away for the rest of his life and not let him die in prison."

¶ 18    The trial court mentioned Ruiz's age and discussed the evidence and the potential for rehabilitation. The court noted Ruiz's "loyal and supportive family." The court said Ruiz had "two personas, one for his family and the other when he was away from his family." It considered "all of his background" and whether he posed a threat to society. Ultimately, the trial court sentenced Ruiz to 40 years for Walls's murder and a concurrent 15 years for the aggravated discharge of a firearm.

¶ 19    In 2010, after we ordered second stage postconviction proceedings, Ruiz filed the final version of his first postconviction petition, raising 22 claims. The trial court dismissed the petition at the second stage. Ruiz pressed three of those claims on appeal—that his direct appeal counsel was ineffective (i) for failing to challenge the trial court's denial of a second degree murder instruction, (ii) for failing to challenge the use of an "outdated" pattern jury instruction, and (iii) for failing to litigate a motion to suppress statements. *Id.* ¶¶ 17, 22, 26. We affirmed the second-stage dismissal. *Id.* ¶ 28.

¶ 20    In 2016, Ruiz filed a motion for leave to file a successive postconviction petition. He raised four claims, three relevant here: (i) his 40-year sentence constituted a *de facto* life sentence in violation of the Illinois Constitution and the eighth amendment to the United States Constitution, (ii) his trial counsel was ineffective for failing to investigate and call Christopher Anderson as a witness at trial, and (iii) Ruiz was actually innocent, based on an affidavit from Anderson explaining that Ruiz had knowledge of a shooting perpetrated by rival gang members the a week before Walls's murder.

¶ 21    In support of his ineffectiveness and actual innocence claims, Ruiz attached an affidavit from Anderson. According to Anderson, on October 31, 1998, four members of the Gangster Disciples shot him in the face. On November 2, Ruiz visited Anderson in the hospital. Anderson told him that the "four black males" who had shot him made Gangster Disciple hand signs and shouted "GD m***." On the day of the Walls shooting, Anderson had warned Ruiz to "watch out for them GDs." Anderson explained that he would not have testified at Ruiz's trial because he "didn't want any more trouble from anyone including the GDs."

¶ 22    Ruiz also attached an affidavit explaining that he told his trial counsel to investigate and subpoena Anderson as a witness "three different times." According to Ruiz, his counsel refused because he would not "go into [Ruiz's] bad neighborhood and risk getting shot just to summon [witnesses]." Ruiz's counsel allegedly told Ruiz that if he wanted witnesses at trial, Ruiz would have to get them himself.

¶ 23    Ruiz supported his sentencing claim by citing both Illinois Supreme Court and United States Supreme Court decisions about constitutional protections available to juveniles during their sentencing proceedings. Ruiz's petition referenced social science articles in arguing that brain development does not conclude when a person reaches 18 years, so the case law applicable to juveniles should also apply to him. And Ruiz argued that his sentence constituted a *de facto* life sentence imposed by the trial court without considering his age.

¶ 24    In a one-sentence oral ruling, the trial court denied Ruiz leave to file his successive petition, saying, "In the matter of Israel Ruiz, request to proceed *in forma pauperis* is denied. Off call."

ANALYSIS

¶ 26    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) allows a petitioner to raise a claim of a violation of constitutional rights in the original trial or sentencing proceedings. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The Act contemplates the filing of only one postconviction petition. *Id.* at 455-56. Claims not raised in the initial petition are waived (*id.* at 456; see also 725 ILCS 5/122-3 (West 2018)) unless the defendant (i) shows cause for and prejudice from failing to raise the claim in the earlier petition or (ii) makes a colorable claim of actual innocence. *Pitsonbarger*, 205 Ill. 2d at 459-60. We review the trial court's decision to deny leave to file a successive petition *de novo*, accepting all well-pled facts and attached affidavits as true. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

Applicability of *Miller* to Ruiz

¶ 28    Ruiz challenges his 40-year discretionary sentence as unconstitutional under both the United States and Illinois Constitutions because the trial court failed to consider his young age (18 years old) when sentencing him. Ruiz must "demonstrate [ ] cause for his *** failure to bring the claim in his *** initial post-conviction proceedings and [that] prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). The Act defines "cause" as "an objective factor that impeded [the petitioner's] ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* "Prejudice" involves the "demonstrati[on] that the claim not raised during [the petitioner's] initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.* The cause-and-prejudice test establishes a more onerous standard than that at the first-stage pleading stage. *People v. Smith*, 2014 IL 115946, ¶ 35. Leave to file a successive petition should be denied where (i) the petitioner's claims "fail as a matter of law" or (ii) the petition and accompanying documents are "insufficient to justify further proceedings." *Id.*

¶ 29    The State does not concede cause, but ignores it in its brief. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("[p]oints not argued are forfeited"). What's more, our supreme court has already said that "*Miller*'s new substantive rule constitutes 'cause' because it was not available earlier to counsel." *People v. Davis*, 2014 IL 115595, ¶ 42 (citing *Pitsonbarger*, 205 Ill. 2d at 460-61). Ruiz's sentencing occurred years before the United States Supreme Court decided *Miller*, and even longer before our supreme court suggested that young adults could attempt to show *Miller*'s application to them in postconviction proceedings. See *People v. Harris*, 2018 IL 121932, ¶ 48. Ruiz has shown cause for failing to raise this claim in the earlier proceeding.

¶ 30    Instead, the State argues that Ruiz cannot establish prejudice because (i) the constitutional protections afforded to juveniles in sentencing proceedings should not extend to young adults, (ii) even if those protections apply to young adults, they do not apply to Ruiz because his

*de facto* life sentence was not mandatory, and (iii) even if constitutional and juvenile sentencing protections apply to young adults given discretionary life sentences, Ruiz has failed to show eligibility for those protections or that the trial court failed to consider his youth at the original sentencing hearing. We disagree with each of these contentions.

¶ 31 We first dispose of Ruiz's eighth amendment argument. In a series of cases, the United States Supreme Court found that the eighth amendment prohibits capital punishment and mandatory life sentences for juvenile offenders. *People v. Buffer*, 2019 IL 122327, ¶ 16 (citing *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005) (prohibiting capital punishment for juveniles); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (prohibiting mandatory life sentences for juveniles convicted of nonhomicide offenses); *Miller*, 567 U.S. at 489 (prohibiting mandatory life sentences for juveniles convicted of murder)). Our supreme court has read the eighth amendment protections afforded to juvenile sentencing as extending to discretionary life sentences. *People v. Holman*, 2017 IL 120655, ¶ 40. For eighth amendment purposes, our court has "draw[n] a line at 40 years" to demarcate a life sentence for a juvenile offender. *Buffer*, 2019 IL 122327, ¶ 40.

¶ 32 Ruiz's 40-year sentence qualifies him for the protections that *Miller* affords a juvenile. But Ruiz committed the offense at age 18. Recently, and forcefully, our supreme court reaffirmed under 18 as the age cutoff for juvenile sentencing protections in the eighth amendment context. See *Harris*, 2018 IL 121932, ¶¶ 54-61. Ruiz cites no Illinois cases casting doubt on *Harris*, but rather relies heavily on secondary sources explaining the brain development of young adults. *Harris* rejected that argument. *Id.* ¶¶ 59-60. We must follow *Harris*'s interpretation of the eighth amendment.

¶ 33 While *Harris* foreclosed Ruiz's eighth amendment argument, it pointedly left open the applicability of the Illinois Constitution. See *id.* ¶ 48 (inviting defendant to raise his Illinois constitutional challenge to his life sentence in collateral proceeding, either in a postconviction petition or a petition for relief from judgment). Ruiz argues that he has adequately alleged prejudice under the Illinois Constitution's proportionate penalties clause to warrant the filing of his successive petition. We agree.

¶ 34 We have held that the Illinois Constitution prohibits a mandatory life sentence for a young adult offender who was 19 at the time of the offense. *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 63-65. We ordered a new sentencing hearing, during which "both defendant and the State will have the opportunity to fully explore defendant's argument and the evolving science on juvenile brain development." *Id.* ¶ 72. We decline the State's invitation to depart from *House*.

¶ 35 The State urges us to reject *House* because, in its view, the decision "contravened clear directives set forth in *People v. Harris*, 2018 IL 121932." We disagree.

¶ 36 Our supreme court turned down the defendant's Illinois constitutional claim in *Harris* because the claim had not been preserved. *Harris*, 2018 IL 121932, ¶ 40 ("an evidentiary hearing was not held on [the defendant's] constitutional claim, and the trial court did not make any findings of fact on defendant's specific circumstances"). *House* did no more than take up our supreme court's invitation in *Harris* on a fully developed record. See *House*, 2019 IL App (1st) 110580-B, ¶ 65.

¶ 37 Recently, another division of this court distinguished *House*, but did not disagree with it. *People v. Handy*, 2019 IL App (1st) 170213. Because the court decided *Handy* after the State filed its brief, we granted the State's motion to cite *Handy* as additional authority. The State

urges us to follow *Handy*, which distinguished *House* on two grounds: (i) the defendant in *Handy* participated in the offense instead of merely acting as a lookout and (ii) the sentence in *Handy* was discretionary, while in *House*, it was mandatory. *Id.* ¶¶ 40-41. We disagree with both distinctions.

¶ 38   We see no principled basis on which to distinguish *House* based on the level of a defendant's participation in the offense. Remember, one of the most fundamental aspects of the Supreme Court's *Miller* line of cases insists that juvenile sentencing considerations apply even to those who commit heinous crimes—extending constitutional protections to juveniles who commit murder. *Miller*, 567 U.S. at 472 ("*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." (Emphasis added.)). When the Court looked at the four pillars of penological justification—retribution, deterrence, incapacitation, and rehabilitation—it focused on how each related to characteristics of the *offender*, not the offense. *Id.* at 472-73. Retribution relates to the offender's blameworthiness, by definition lower for juveniles. *Id.* at 472. Deterrence has lower effectiveness due to their "immaturity, recklessness, and impetuosity." *Id.* Incapacitation is less salient because it requires a judgment of incorrigibility, which is "inconsistent with youth." (Internal quotation marks omitted.) *Id.* at 472-73. And a life sentence eliminates rehabilitation altogether. *Id.* at 473.

¶ 39   But our ruling hinges on whether the trial court adequately considered the constitutionally relevant factor of Ruiz's youth and attendant characteristics, and not on whether Ruiz's sentence is substantively constitutional (*i.e.*, proportionate). Admittedly, the degree Ruiz participated in the offense remains a consideration during his sentencing proceeding. *E.g.*, *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 24 ("The most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense."). To prevent young adult offenders from relying on the mitigating circumstance of their youth simply because they more directly participated in the offense would be error. See *Miller*, 567 U.S. at 472.

¶ 40   We also see no support for distinguishing *House* on the ground that Ruiz's sentence was discretionary. Our supreme court eliminated the distinction between mandatory and discretionary life sentences when juveniles raise constitutional challenges. See *Buffer*, 2019 IL 122327, ¶ 27 (to succeed on *Miller* claim, juvenile must show, in part, that he or she "was subject to a life sentence, mandatory or discretionary" (citing *Holman*, 2017 IL 120655, ¶ 40)). Because we agree with *House* that juvenile sentencing provisions apply to Ruiz as a legal matter, the distinction between mandatory and discretionary sentences evaporates.

¶ 41   Finally, the State argues that even if *Buffer* applies to certain young adults, the 40-year floor it set cannot be the right number for an adult offender. On the surface, this argument has some force: there are some mandatory minimum sentences for murder that can be as much as 45 years with enhancements. See 730 ILCS 5/5-4.5-20(a) (West 2018) (20-years mandatory minimum for first degree murder); *id.* § 5-8-1(a)(1)(d)(iii) (25-year add-on for committing murder with firearm). The State overreads *Buffer* on each contention.

¶ 42   We emphasize what *Buffer* did not do—namely, say that every sentence imposed on a juvenile of longer than 40 years is *per se* unconstitutional. The only aspect of Buffer's sentence that was unconstitutional concerned the trial court failing to consider his youth at the time of sentencing. *Buffer*, 2019 IL 122327, ¶ 42. So the trial court undoubtedly could impose an

- 7 -

enhanced sentence on a young adult offender if it complied with the constitutional prerequisite of considering the offender's youth.

¶ 43 The dissent amplifies the State's argument that 40 years would not be a *de facto* life sentence for Ruiz, even if he were treated as a juvenile for sentencing purposes. But this ignores the origin of the Illinois Supreme Court's 40-year number. Instead of being based on "court decisions, legal literature, or statistical data," it owes its origin to specific provisions in the Juvenile Court Act reflecting a legislative judgment that 40 years constitutes a constitutionally acceptable sentence for juveniles. *Id.* ¶¶ 37-41. As we have emphasized throughout this opinion, the Juvenile Court Act was not applied to Ruiz's sentence because the trial court considered him an adult under the law.

¶ 44 We acknowledge some dissonance between Ruiz's request to be treated as a juvenile for sentencing purposes and our conclusion that he is not subject to *Buffer*'s 40-year floor. But we cannot ignore the simple fact of chronological age. There is a difference between a 15-year-old subject to a 40-year sentence who would be released at age 55 and an 18-year-old subject to a 40-year sentence who would not be released until age 58. This may seem like a trivial difference, but it offends statistical predictions about life expectancy for young people who receive long prison sentences. See *id.* ¶¶ 65-67 (Burke, J., specially concurring) (finding that the maximum sentence that should be imposed on juveniles is one that allows release at age 55).

¶ 45 When it comes to young adults subject to juvenile sentencing provisions, our supreme court has not yet set a lower limit on the length of a sentence that violates *Miller* provisions. As it stands now, because the defendant in *Buffer* was a juvenile and our supreme court crafted its rule based on a statute applicable only to juveniles, *Buffer* does not foreclose our conclusion.

¶ 46 At oral argument, discussion involved the decision in *Holman* and, an appellate decision applying *Holman*, *People v. Croft*, 2018 IL App (1st) 150043. In *Holman*, our supreme court said, "A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered" a set of five factors. *Holman*, 2017 IL 120655, ¶¶ 46-47. Those factors include (i) defendant's chronological age and any accompanying evidence of "particular immaturity, impetuosity, and failure to appreciate risks and consequences"; (ii) defendant's family and home environment; (iii) defendant's degree of participation in the homicide and any evidence of familial or peer pressure; (iv) defendant's incompetence, specifically his or her inability to deal with police officers or lawyers; and (v) defendant's prospects for rehabilitation. *Id.* ¶ 46. In *Croft*, the court addressed the factors in a case in which a juvenile defendant appealed from the second stage of successive postconviction proceedings. The court affirmed because the trial court at the original sentencing had sufficiently considered the *Holman* factors. *Croft*, 2018 IL App (1st) 150043, ¶¶ 24-32. The State, accompanied by the dissent, urges us to follow the same procedure.

¶ 47 We decline due to a host of material distinctions between *Holman* and *Croft* and Ruiz (and Johnson). First, and most significantly, defendants in *Holman* and *Croft* were 17, and, thus, juveniles, at the time of their offenses. *Holman*, 2017 IL 120655, ¶ 1; *Croft*, 2018 IL App (1st) 150043, ¶ 4. This means *Miller* presumptively applied to them as a matter of law. *Harris*, 2018 IL 121932, ¶ 44 ("the defendant in *Holman* fell squarely under *Miller* because he was a juvenile when his crime was committed"). Ruiz (and Johnson) must make a preliminary showing *before* the court undertakes a *Holman* analysis—that is, establish that *Miller* applies to them in the first place.

¶ 48    As we said at the outset, this greatly narrows the relief we can afford to Ruiz. We must remand to allow Ruiz to put forward evidence to support his claim that *Miller* applies to him. The *Holman* factors undoubtedly lie ahead, but only if Ruiz can make that first showing.

¶ 49    Also, extremely different procedural postures existed in *Holman* and *Croft*. In *Holman*, the juvenile defendant sought leave to file a successive postconviction petition in which he did not raise a *Miller* claim. *Holman*, 2017 IL 120655, ¶ 27. Our supreme court addressed the merits of his claim "in the interests of judicial economy" because the original record sufficiently developed an as-applied claim. *Id.* ¶ 32. More importantly, immediately before announcing the applicable considerations distilled into a five-factor test in *Miller*, *Holman* said, "For *juvenile* defendants like the defendant in this case ***, any inquiry into the *Miller* factors is backwards-looking." (Emphasis added.) *Id.* ¶ 47. That the defendant was a juvenile provided a foundational premise. The record had been sufficiently developed because no fact-finding needed to occur to determine whether *Miller* applied to a juvenile defendant.

¶ 50    The procedural differences between *Croft* and Ruiz are even more stark. The defendant in *Croft* had already been granted leave to file his successive postconviction petition, had been appointed counsel, and had his petition dismissed at the second stage of postconviction proceedings. *Croft*, 2018 IL App (1st) 150043, ¶ 12. In other words, the proceedings had arrived at the stage at which defendant's burden is higher and after which appointed counsel had an opportunity to further develop Croft's claims. See 725 ILCS 5/122-4 (West 2018). And, as we have said at some length already, the defendant in *Croft*, as a juvenile, did not have to make the preliminary showing under *Harris* that the *Miller* line of cases applied to him.

¶ 51    We have no quarrel with the procedures announced in *Holman* and applied in *Croft*; indeed, if Ruiz (and Johnson) convince the trial court on remand that *Miller* applies to them as young adults, the trial court will have to consider *Holman* and *Croft* before it can grant resentencing.

¶ 52    We find that considering *Holman* now puts the proverbial cart before the horse. As *Harris* instructs, young adult defendants are not entitled to a presumption that *Miller* applies to them (unlike the defendants in *Holman* and *Croft*). See *Harris*, 2018 IL 121932, ¶ 44. So when young adults raise claims that the *Miller* line of cases applies to them, we read our supreme court's precedents to set out this procedure:

    (i) under *Harris*, a young adult defendant must plead, and ultimately prove, that his or her individual characteristics require the application of *Miller*;

    (ii) if, and only if, the young adult makes this showing, then the trial court goes on to consider whether the initial sentencing hearing complied with *Miller*, following our supreme court's guidance in *Holman* and this court's analysis in *Croft*; and

    (iii) if the initial sentencing hearing was *Miller*-compliant, then the trial court can reject the defendant's claim (as the courts did in *Holman* and *Croft*); or if the initial sentencing hearing was not *Miller*-compliant, then the trial court should order resentencing.

¶ 53    We hold that Ruiz has stated a claim that, as a matter of law, prejudice has been caused by reason of Ruiz's justified failure to raise a constitutional challenge to his sentence in his initial postconviction petition. Contrary to the dissent's assertions, this procedure does not "fail[ ] to recognize that the 'prejudice' factor must be shown." We simply disagree about the nature of the prejudice. By failing to raise the claim in his initial postconviction petition, Ruiz was deprived of an opportunity to make a *Miller* argument at all due to his status as an adult at the

time of the offense. In other words, even if he had raised a *Miller* claim in his initial petition, it would have been rejected out of hand because of his age. By pleading *Miller*'s applicability to him as a young adult, Ruiz has attempted to cure that prejudice. We agree that he should be given that chance in further postconviction proceedings.

¶ 54    As *Harris* instructs, young adult defendants are not entitled to make an as-applied challenge to their sentences under *Miller* unless they first show that *Miller* applies to them. *Id.* ¶ 45 ("The record must be developed sufficiently to address defendant's claim that *Miller* applies to his particular circumstances."). If our supreme court conceptualized prejudice in the same way as the dissent, then much of the analysis in *Harris* makes no sense—the court would have just assumed *Miller* applied to the defendant and evaluated his initial sentencing hearing. Of course, the court did not do that. Indeed, the dissent's rationale, by sidelining *Harris*, provides Johnson with a merits ruling on his *Miller* claim to which he may not be entitled. The trial court should determine the applicability of *Miller*, as a factual matter, in the first instance.

¶ 55    Our analysis, however, is not finished—the petition and accompanying documents also must be enough to justify further proceedings. *Smith*, 2014 IL 115946, ¶ 35. Importantly, while *Harris* left open the possibility of a proportionate penalties clause claim for a young adult, the Illinois Supreme Court instructed that a defendant must show "how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46. We are at the pleading stage, so Ruiz is not required to prove anything. He needs only to plead facts justifying further proceedings.

¶ 56    Ruiz's petition, in detailed, well-cited legal argument, sets out why the protections in *Miller*, and in the Illinois cases applying it, should benefit young adults. Ruiz cited "recent research and articles" showing that the brain does not fully develop until the mid-20s, claiming that "young adults as Ruiz was at 18 years old are more like adolescents than fully mature adults." Ruiz claimed that he too was "largely unsettled in [his] characters and habits and this must be taken into consideration" during sentencing. He claimed that his sentencing hearing "clearly did not adequately focus on Ruiz['s] age of 18 and his rehabilitative potential." And Ruiz alleged, "[h]ad the court held a hearing specifically tailored to address each of these [*Miller*] factors, the court may well have determined a lesser sentence was appropriate." These facts suffice to make out a *prima facie* case that *Miller* should apply to Ruiz.

¶ 57    Ruiz submitted a motion to cite *People v. Carrasquillo*, 2020 IL App (1st) 180534. We granted the motion but find *Carrasquillo* too different to be of any help. When analyzing the prejudice prong of the cause and prejudice test, the court emphasized three factors that set *Carasquillo* apart: (i) defendant's age had been misstated in the review of his sentence on direct appeal; (ii) defendant's sentence was clouded by the specter of corruption where his "sentence was one of the very harshest that Judge Wilson delivered, and Judge Wilson did so during a year when he had accepted a bribe, during a trial with a conspicuous police presence, and to an 18-year old with no prior criminal record"; and (iii) defendant had been eligible for parole and had his requests denied. *Id.* ¶¶ 110-11. The analysis in *Carrasquillo* is unique to that case when it comes to a *Miller* claim, given all the individualized facts animating its analysis. We find nothing disagreeable in *Carrasquillo*; it simply does not aid our consideration of Ruiz's appeal.

¶ 58    As we recently reaffirmed, " 'Illinois has been a national leader in the field of juvenile justice.' " *In re Mathias H.*, 2019 IL App (1st) 182250, ¶ 29 (quoting *In re Shermaine S.*, 2015

- 10 -

IL App (1st) 142421, ¶ 32). Other states have extended the considerations in *Miller* to young adults 18 and over. In the State of Washington, for example, the supreme court referred to "studies that established a clear connection between youth and decreased moral culpability for criminal conduct." *State v. O'Dell*, 358 P.3d 359, 366 (Wash. 2015). The court held that "a trial court must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender like [defendant], who committed his offense just a few days after he turned 18." *Id.* In this way, the law must often play catch-up to other fields of empirical study. For example, in *Robinson v. California*, 370 U.S. 660 (1962), the United States Supreme Court relied on shifting understanding of the nature of addiction—as an illness, not a crime—to find the criminalization of addict status unconstitutional. As Justice Douglas observed in his concurrence, centuries of common thought about the nature of addiction had turned out to be wrong. *Id.* at 668-78 (Douglas, J., concurring).

¶ 59    At this stage, we must accept Ruiz's allegations as true. *Edwards*, 2012 IL App (1st) 091651, ¶ 25. Ruiz's claim is not barred by our conception of what the law has been; Ruiz should have been allowed to proceed based on his well-pled assertions. See *Harris*, 2018 IL 121932, ¶¶ 46-48. His claim has yet to be decided. That determination is not for this court, but the trial court. For now, the trial court erred when it denied leave to file his claim.

¶ 60                                    Ineffective Assistance of Counsel

¶ 61    Ruiz next claims that the trial court erred in denying leave to file his claim that trial counsel was ineffective for failing to investigate and call Christopher Anderson as a witness at trial. The State responds that Ruiz has failed to establish cause for failing to bring this claim in Ruiz's initial postconviction petition because nothing in the record indicates that Anderson would not have come forward then. We agree that Ruiz has not established cause for failing to bring this claim earlier, although we reject the State's assertion that Anderson might have come forward in 2006 because that would require us to second-guess the facts in Anderson's affidavit. See *Edwards*, 2012 IL App (1st) 091651, ¶ 25 (we must accept all facts alleged in affidavit as true). Instead, we find Ruiz failed to establish cause because Anderson's affidavit would not have been necessary for an ineffectiveness claim in Ruiz's first petition.

¶ 62    We apply the same definition of cause as in Ruiz's sentencing claim (*supra* ¶ 28), and we find no objective factor impeding Ruiz's ability to raise his counsel's ineffectiveness in his initial postconviction proceedings. As Ruiz correctly argues, the "[f]ailure to present available witnesses to corroborate a defense has been found to be ineffective assistance." *People v. Makiel*, 358 Ill. App. 3d 102, 107-08 (2005). Ordinarily, when a petitioner raises a claim of ineffectiveness based on trial counsel's failure to investigate or call a witness, an affidavit from that witness is required. *E.g.*, *People v. Johnson*, 183 Ill. 2d 176, 192 (1998). But this rule has never been a bright-line rule. *People v. Dupree*, 2018 IL 122307, ¶ 34. Instead, the court "has always held that dismissal [of a postconviction petition] is proper when the record or other evidence *** does not support the petitioner's claim." *Id.* This follows the Act, which requires a petition to be supported by " 'affidavits, records, or other evidence.' " *Id.* ¶ 32 (citing 725 ILCS 5/122-2 (West 2014)). While an affidavit from the nontestifying witness often may be necessary to claim ineffective assistance for failing to call that witness, the affidavit "will be required [only] if it is essential *** to support a claim of ineffective assistance." *Id.* ¶ 34.

¶ 63    Anderson's affidavit was unnecessary. Ruiz's affidavit, attached to his successive petition, avers that he told trial counsel about Anderson and, before trial, gave counsel Anderson's home

address. Ruiz also claimed that counsel's only reason for failing to investigate involved counsel's desire to avoid "[Ruiz's] bad neighborhood." Then, as we have already related, Ruiz's statement to Assistance State's Attorney Quinn provided the essential content of Anderson's proposed testimony—Anderson had been shot by Gangster Disciples a week before, and Ruiz knew about it at the time of the Walls shooting. So the record and Ruiz's own affidavit supports his claim of ineffectiveness.

¶ 64 The trial record directly supports the testimony that Ruiz believed could be provided by Anderson. Also, Ruiz's affidavit shows that he asked counsel to investigate Anderson. So nothing prevented Ruiz from alleging counsel's ineffectiveness in his first petition. See *id.* ¶¶ 35-42 (distinguishing *People v. Thompkins*, 161 Ill. 2d 148 (1994), *People v. Guest*, 166 Ill. 2d 381 (1995), *Johnson*, 183 Ill. 2d 176, and *People v. Enis*, 194 Ill. 2d 361 (2000)). Ruiz has failed to show cause for failing to raise this claim in his initial postconviction petition. The trial court properly denied him leave to file this claim in a successive petition.

¶ 65                                            Actual Innocence

¶ 66 To prevail on a claim of actual innocence, a successive postconviction petitioner "must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. New evidence means evidence "discovered after trial [that] could not have been discovered earlier through the exercise of due diligence." *Id.* Material evidence means evidence "relevant and probative of the petitioner's innocence." *Id.* And conclusive evidence encompasses evidence considered, along with the trial evidence, that "would probably lead to a different result." *Id.* A trial court can only deny leave to file a successive postconviction petition raising a claim of actual innocence "where it is clear *** that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *People v. Edwards*, 2012 IL 111711, ¶ 24. A petitioner need only set out a *prima facie* case at the leave-to-file stage. *People v. Bailey*, 2017 IL 121450, ¶ 24.

¶ 67 Ruiz argues that the evidence, in the form of Anderson's testimony, constitutes newly discovered evidence because Anderson "would not come forward" at trial. Ruiz admits that he "knew about Anderson's account at the time of trial," which the State argues defeats a contention of newly discovered evidence. According to the State, evidence cannot be newly discovered if Ruiz knew about the relevant facts, even if the source of those facts recently agreed to come forward. We agree with the State. "[E]vidence is not newly discovered when it presents facts already known to a defendant at or prior to trial, though the source of those facts may have been unknown, unavailable, *or uncooperative*." (Emphasis added.) *People v. Jones*, 399 Ill. App. 3d 341, 364 (2010) (collecting cases). Under this standard, the evidence in Anderson's affidavit cannot be described as "newly discovered."

¶ 68 Anderson's affidavit says, "On October 31st 1998 I was shot in the face by (4) four rival gang members." In his statement to ASA Quinn, Ruiz explained that "Chris Anderson had been shot on Halloween Night in the face by rival gang members pertaining to the Gangster Disciples." Anderson's affidavit says, "I told Ruiz the GDs were all in black." Ruiz's statement to ASA Quinn goes on, "[Ruiz] said he could see across the street and he could see three black teenagers. He told me they were dressed all in black. And he told me he could immediately tell they were members of the Gangster Disciples." After Ruiz saw these men, according to his statement, he shot at them and ran away. Ruiz knew about the information in Anderson's

affidavit—that Gangster Disciples shot Anderson and that they dressed in black—at the time of trial, and the jury heard it through his statement to ASA Quinn.

¶ 69 We find *People v. Manrique*, 351 Ill. App. 3d 277 (2004), on which Ruiz relies, distinguishable. There, officers pulled over a motor home driven by Andres Montoya for speeding. Defendant was a passenger. *Id.* at 278. During a consent search of the motor home, officers found bricks of cocaine. *Id.* at 278-79. In a successive postconviction petition, the defendant raised a claim of actual innocence and attached an affidavit from Montoya saying he was willing to testify that the defendant did not know about the cocaine. *Id.* at 279. In proceedings on the defendant's initial postconviction petition, it came out that trial counsel had attempted to call Montoya at the original trial, but Montoya's attorney had asserted "his fifth amendment right against self-incrimination." *Id.*

¶ 70 The appellate court found Montoya's affidavit to be newly discovered evidence because, given his intent to assert his constitutional right against self-incrimination at trial, "Montoya's testimony was unavailable to the defendant." *Id.* at 280-81. Montoya, as the driver of the motor home, could easily have been implicated had he testified that Manrique knew nothing about the illicit drugs. He was not merely unwilling to testify (see, *e.g.*, *Jones*, 399 Ill. App. 3d at 354), he had a constitutional right not to testify. See also *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) ("no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination"). We decline to equate a witness asserting "I do not want to testify" with a witness asserting "I have a right not to testify." See *Edwards*, 2012 IL 111711, ¶¶ 35-38 (drawing distinction between witnesses who refused to testify and codefendant who had a constitutional right not to testify).

¶ 71 Because Ruiz knew the information in Anderson's affidavit at the time of trial, and because the jury was exposed to that information through Ruiz's statement, the evidence is not "newly discovered," despite Anderson's former reluctance to testify. Ruiz's claim of actual innocence fails as a matter of law. The trial court properly denied leave to file this claim.

¶ 72 Affirmed in part and reversed in part.
¶ 73 Cause remanded.

¶ 74 JUSTICE PIERCE, dissenting:

¶ 75 I agree with the majority's finding that Ruiz's eighth amendment claim lacks merit. However, I write to express my disagreement with the majority's finding that Ruiz's case should be remanded to the circuit court to allow him an opportunity to prove his *Miller* claims and, if proven, to allow the trial court the opportunity to judge the credibility of those claims.

¶ 76 To be clear, in his appeal Ruiz states that he "seeks a new sentencing hearing" based on *Miller* factors that do not apply to adult offenders. He wants to receive the same protections afforded juveniles even though he is an adult. However, if Ruiz was a 15-year-old at the time of this offense, he would not be eligible for a resentencing hearing based on the *Miller* principles because his 40-year sentence was not a *de facto* life sentence. *Miller*-related jurisprudence concerns the imposition of a mandatory or discretionary natural or *de facto* life sentence imposed on a juvenile. *People v. Buffer*, 2019 IL 122327, ¶ 27. Our supreme court has determined that where a juvenile defendant's sentence falls within this category, he must then show that the sentencing court failed to consider his youth and attendant characteristics

- 13 -

when imposing the sentence in order to obtain a new sentencing hearing. *Id.* And our supreme court has declared that "*a prison sentence of 40 years or less* imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." (Emphasis added.) *Id.* ¶ 41. On its face, even if Ruiz was a juvenile at the time of this murder, his request for a new sentencing hearing would fail because he did not receive a *de facto* life sentence of more than 40 years.

¶ 77 But Ruiz was an 18-year-old defendant sentenced to a 40-year term of imprisonment. He was not a juvenile at the time of the offense, and he did not receive a *de facto* sentence of life imprisonment. Because there is no authority to extend to this adult defendant protections that would not be available to any juvenile defendant that did not receive a *de facto* life sentence, his *Miller* claim should also be dismissed, and the judgment should be affirmed.

¶ 78 I further disagree with the majority's approach in keeping Ruiz's *Miller* claims on life support. In my opinion, the *Miller* principles do not apply to this adult, 18-year-old defendant who did not receive a *de facto* life sentence. However, even assuming that *Miller* applies, Ruiz should not be given leave to file a successive postconviction petition because Ruiz simply cannot establish the necessary prejudice where the record before us shows that his sentencing hearing complied with *Miller*. Consistent with the directives of *Holman*, 2017 IL 120665, and applying the analysis we used in *Croft*, 2018 IL App (1st) 150043, I would review the sentencing record that we have and find that there was no constitutional violation in the imposition of Ruiz's sentence.

¶ 79 The majority finds that *Harris*, 2018 IL 121932, opens the Illinois Constitution for a *Miller* challenge by way of collateral attack. I do not disagree. However, *Harris* is inapposite. In *Harris*, the 18-year-old defendant argued that his 76-year sentence shocked the moral sense of the community, given the facts of his case, his youth, and other mitigating circumstances. Our supreme court held that *the record before the court was insufficient* to consider the defendant's contention that *Miller* applied in the context of his proportionate penalties claim because a *Holman* analysis could not be made by the court where the trial court did not hold an evidentiary hearing and the trial court made no findings of fact on Harris's specific circumstances to support his *Miller* claim. The *Harris* court declined to consider the *Miller* issue but noted that the defendant was not foreclosed from raising the claim and that it "*could *** potentially be raised*" in a postconviction petition. (Emphasis added). *Id.* ¶ 48.

¶ 80 Ruiz claims, and the majority agrees, that given the procedural posture of his case, *Harris* affords him the opportunity to establish his as-applied *Miller* challenge in the trial court with the assistance of postconviction counsel and therefore he should be given leave to file his successive postconviction petition. However, the *Harris* court's statement that a defendant could potentially raise a *Miller* claim in a postconviction petition was based on the fact that the record on appeal was insufficient to consider Harris's claim where there was no record of any hearing or finding of facts in the trial court to support his *Miller* claim.

¶ 81 In contrast, Ruiz had an extensive and detailed sentencing hearing where the trial court considered the nature of the offense, defendant's social and criminal background, and, importantly, his young age. As we stated in *Croft*, "a key feature of the juvenile's sentencing hearing is that the defendant had the '*opportunity* to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.' " (Emphasis added.) *Croft*, 2018 IL App (1st) 150043, ¶ 23 (quoting *Holman*, 2017 IL 120655, ¶ 49). Croft noted that the *Holman* factors are "a nonexhaustive list" and that "nothing in *Miller* or *Holman* suggests that

we are free to substitute our judgment for that of the sentencing court" because the issue is not the particular sentence the trial court imposed but whether defendant had the opportunity to present evidence regarding his youth and that the court considered his youth and its attendant characteristics in reaching its sentencing decision. *Id.* ¶¶ 32-33.

¶ 82     Accepting Ruiz's contention, which I do not agree with, that *Miller* applies to an 18-year-old (see *Edwards*, 2012 IL App (1st) 091651, ¶ 25 (at this stage we must accept Ruiz's allegations as true)), the majority simply fails to recognize that Ruiz had a *Miller* compliant sentencing hearing. At the sentencing hearing for this 18-year-old, the trial court considered the same factors that the *Holman* court found to be constitutionally consistent with *Miller*. Consequently, in my view, because we have a sufficient record before us, the analysis employed in *Croft* is the analysis that the majority should apply and find that defendant was correctly sentenced.

¶ 83     Similar to *Croft*, and assuming that the *Miller* factors apply to young adults like Ruiz, we have the benefit of the cold, well-developed record of Ruiz's sentencing hearing that allows us to determine whether that hearing met the *Miller* requirements. Because we have a more than adequate record, we must review Ruiz's claim in accordance with the guidance provided under *Holman* and affirm the denial of the petition for leave to file a successive postconviction petition. Ruiz clearly had the opportunity to present his youthful mitigation argument to the trial court during his sentencing hearing. ("[W]e have examined the cold record of the circuit court's [sentencing] hearing ***, which includes the common-law record and report of proceedings, and find that the circuit court considered evidence of the defendant's youth and its attendant characteristics at the time of sentencing and that the defendant had" the opportunity required by *Holman*. *Croft*, 2018 IL App (1st) 150043, ¶ 24.) As in *Croft*, the trial court in this case had before it the trial testimony, the evidence, Ruiz's PSI, and the sentencing arguments of the parties before it sentenced Ruiz.

¶ 84     The cold record of Ruiz's sentencing hearing emphatically demonstrates that the court did consider defendant's age and its attendant characteristics as mitigating factors in crafting the appropriate sentence for the first degree murder of Nathaniel Walls and the aggravated discharge of a firearm at Malik Walls. The record reflects that evidence was presented at the sentencing hearing concerning most of the factors to be considered as set out in *Holman*. First, the court considered the fact that Ruiz was a little over 18 years old at the time of the murder. Ruiz's young age was emphasized by defense counsel and noted in the PSI. The court was also fully aware of Ruiz's background. As to Ruiz's immaturity, there was no evidence that Ruiz was in any way immature or developmentally delayed. He had an eighth-grade education, he had a "great" relationship with teachers, he could hold down a job, and he had goals of getting his GED. The court was also aware that Ruiz had no mental health issues that would explain his behavior. Rather, the facts of the case showed that Ruiz committed the murder because he was an active gang member. Ruiz made the choice to be in a gang, and he also made the conscious decision to arm himself with a gun and shoot at Nathaniel Walls and his three-year-old son Malik Walls, killing Nathaniel. Ruiz's actions were not the result of peer pressure. Instead, Ruiz was the lead and primary actor in this murder.

¶ 85     The trial court was also aware of the information in the PSI report concerning Ruiz's home life, his relationship with his family members, and any mental or physical characteristics that might have made him less culpable for his crime. The issue of coercion or peer pressure was also considered by the sentencing court when it noted that it had considered the facts of the

case, which showed that Ruiz was the shooter acting independently and not as a result of peer pressure. The court noted the fact that Ruiz "always had the benefit of a very loyal and supportive family." The sentencing court noted that Ruiz has "two personas," one for his family and the other when he is away from his family. Finally, the court heard evidence and argument concerning Ruiz's prospects for rehabilitation, understood his "character," and found him to be fully responsible for his adult criminal activity. After consideration of all the relevant sentencing factors, including factors unique to Ruiz, and after giving him the opportunity for allocution, the trial court determined and imposed an appropriate sentence. Notably, his now-complained-of sentence was affirmed on direct appeal.

¶ 86    Unlike constitutionally defective juvenile sentencing hearings where the characteristics of youth were not considered, the trial court, after finding that Ruiz was the sole cause of the murder of Nathanial Walls and the shooting of three-year-old Malik Walls, imposed an aggregate 40-year sentence. There is simply no basis to allow Ruiz, an adult, leave to file a successive postconviction petition to argue that *Miller* applies to him so he can get a second bite at the sentencing apple, where he did not receive a *de facto* life sentence and where his sentencing hearing considered all the relevant *Miller* factors even though he was an adult.

¶ 87    The majority acknowledges that "[a]s *Harris* instructs, young adult defendants are not entitled to a presumption that *Miller* applies to them (unlike the defendants in *Holman* and *Croft*). See *Harris*, 2018 IL 121932, ¶ 44." *Supra* ¶ 52. The majority then states that *Harris* requires that:

> "(i) *** a young adult defendant must plead, and ultimately prove, that his or her individual characteristics require the application of *Miller*;
>
> (ii) if, and only if, the young adult makes this showing, then the trial court goes on to consider whether the initial sentencing hearing complied with *Miller*, following our supreme court's guidance in *Holman* and this court's analysis in *Croft*; and
>
> (iii) if the initial sentencing hearing was *Miller*-compliant, then the trial court can reject the defendant's claim (as the courts did in *Holman* and *Croft*); or if the initial sentencing hearing was not *Miller*-compliant, then the trial court should order resentencing." *Supra* ¶ 52.

¶ 88    The majority's approach under *Harris* is fundamentally in error because it fails to recognize that the "prejudice" factor that must be established in order to be granted leave to file a successive postconviction petition cannot be established in this case. Ruiz must establish cause *and* prejudice before being granted leave to file a successive postconviction petition. "Prejudice" is defined as an error so infectious to the proceedings that the resulting conviction violates due process. *Pitsonbarger*, 205 Ill. 2d at 464; 725 ILCS 5/122-1(f) (West 2018). The majority errs in casually stating the Ruiz was prejudiced because he had cause for not raising his *Miller* argument in his postconviction petition. This is a misstatement of the application of the prejudice requirement. As previously stated, Ruiz has not established the requisite prejudice sufficient for further proceedings. Because a reviewing court can determine from the cold record that no constitutional error occurred (*Holman*), as we can in this case, then it follows that Ruiz cannot establish the necessary prejudice to be granted leave to file his successive postconviction petition.

¶ 89    The majority also errs in remanding to allow the filing of a successive postconviction petition. Assuming *Miller* applies here, even if the record in this case demonstrated that a constitutional error occurred due to the sentencing court's failure to consider this adult

defendant's youthful characteristics, the appropriate remedy would be to remand for a new sentencing hearing rather than allowing defendant leave to file a successive postconviction petition.

¶ 90 In *Buffer*, 2019 IL 122327, ¶ 7, the juvenile was sentenced to a *de facto* life sentence of 50 years and sought *Miller* protection in his postconviction petition that was summarily dismissed. On review, the supreme court determined that the cold record was sufficient to review the defendant's *Miller* claim, found that no additional factual development was required, and concluded that the defendant's sentence was a *de facto* life sentence that was imposed without the trial court considering the defendant's youth and its attendant characteristics. *Id.* ¶ 42. The court did not allow the filing of the postconviction petition and, instead, remanded for resentencing, stating:

> "[T]he record before us does not require factual development. All of the facts and circumstances to decide defendant's claim are already in the record. [Citation.] While the circuit court stated that it 'considered all of the relevant statutory requirements,' the record does not indicate that the court considered defendant's youth and its attendant characteristics. [Citation.] Accordingly, we earlier held that defendant's 50-year prison sentence, imposed for a crime he committed while a juvenile, violated the eighth amendment. This holding applies retroactively and is cognizable in defendant's postconviction proceeding. [Citation.]
>
> Based on the particular issue raised in this appeal and in the interests of judicial economy, we agree with the appellate court that the proper remedy is to vacate defendant's sentence and to remand for a new sentencing hearing." *Id.* ¶¶ 46-47.

¶ 91 In my view, the record on appeal in this case is unquestionably sufficient to decide whether Ruiz's sentencing hearing complied with *Miller*, even though *Miller* does not apply because Ruiz was 18 at the time of the offense and he did not receive a *de facto* life sentence. The record establishes without question that the trial court considered his age and attendant characteristics and fashioned a sentence that was appropriate for the senseless, yet intentional, crimes he committed.

¶ 92 For these reasons, I respectfully dissent.